UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANICE FLESZAR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 09-cv-2247 |
| v. | ) |
| | ) Judge John W. Darrah |
| AMERICAN MEDICAL | ) |
| ASSOCIATION, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Janice Fleszar brought this action against her former employer,

Defendant American Medical Association ("AMA"). She raises three claims in her

Third Amended Complaint: Count I is a claim for discrimination in violation of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*; Count II is a claim

for retaliation under the ADA; and Count III is a claim for intentional infliction of

emotional distress under Illinois common law. AMA moved for summary judgment on

all counts.

### BACKGROUND

Instead of filing a proper response as required by Local Rule 56.1, Fleszar, who is

now appearing *pro se*, filed various motions in opposition to AMA's Motion for

Summary Judgment.[1] Each is addressed below, followed by a recitation of the relevant,

undisputed material facts, pursuant to Local Rule 56.1.

---

[1] Fleszar filed her Complaint *pro se* on April 13, 2009. On October 15, 2009,
counsel appeared on her behalf and filed an Amended Complaint shortly thereafter. That

*Fleszar's Motions*

In this district, motions for summary judgment must comply with Local Rule 56.1. Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). The nonmoving party also may provide a statement of additional undisputed material facts. *See* Local Rule 56.1(b)(3)(C). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

AMA filed a Statement of Material Facts in Support of AMA's Motion for Summary Judgment pursuant to Local Rule 56.1. Fleszar did not file a response to AMA's Statement of Material Facts and did not file a statement of any additional facts pursuant to Local Rule 56.1(b)(3)(C). Instead, Fleszar filed three additional motions. On June 30, 2011, Fleszar filed a Motion to Strike Document #62 (i.e., AMA's Statement of

---

attorney was granted leave to withdraw on May 18, 2010. At the time, Fleszar's response to AMA's Motion to Dismiss her Second Amended Complaint was due May 21, 2010. When counsel was granted leave to withdraw, the Court asked AMA to withdraw its Motion to Dismiss without prejudice. New counsel finally filed an appearance on Fleszar's behalf on October 28, 2010, and filed a Third Amended Complaint. Fleszar's new counsel moved to withdraw on March 15, 2011. AMA filed its Motion for Summary Judgment on March 29, 2011. Fleszar, again acting *pro se* requested an extension to respond. The extension was granted, but she did not file a proper response to AMA's Motion.

Material Facts). On July 8, 2011, she filed a Motion for Leave to Amend Document #66 (i.e., her Motion to Strike). On July 19, 2011, she filed a Motion to Reopen Discovery and Sanction. She did not file a brief in response to AMA's Motion for Summary Judgment, which was due July 6, 2011.

Although Fleszar's Motion for Leave to Amend incorrectly relies on authority for the amendment of pleadings, it is clear that Fleszar is merely asking to correct a few scrivener's errors in her Motion to Strike. The Motion for Leave to Amend is granted. In her Motion to Strike, as amended, Fleszar sets forth several arguments as to why the Court should strike AMA's Statement of Material Facts in its entirety. First, Fleszar asserts that AMA violated Local Rule 56.1's requirement that a party submit no more than 80 short, separately numbered statements of fact. The rule is somewhat ambiguous as to whether each separately numbered paragraph should be limited to a single fact, but "the district court has the discretion to enforce [Rule 56.1] strictly or somewhat leniently." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 987 (7th Cir. 2001) (citation and internal quotation marks omitted). Each of AMA's 80 paragraphs contains related facts, usually relying on a single source of evidence. Fleszar's Motion to Strike will not be granted on that basis.

Fleszar also asserts that some of AMA's factual assertions are unduly argumentative or that they are unsupported by the evidence cited. Fleszar also identifies several instances of what she characterizes as AMA's provision of false and misleading evidence, and she cites to additional evidence in support of her position. None of these arguments provide a sufficient basis for striking AMA's Statement of Facts in its entirety.

Accordingly, Fleszar's Motion to Strike is denied. However, because Fleszar is *pro se*, the Court will consider the substance of her specific objections in resolving AMA's Motion for Summary Judgment to the extent those objections could have been raised in a proper statement pursuant to Local Rule 56.1(b).

Fleszar's final motion is a Motion to Reopen Discovery and Sanction. She asserts that AMA did not provide all relevant documents during discovery. The parties originally were ordered to complete all discovery by January 12, 2011. That deadline was later extended to March 1, 2011. Although she is now *pro se*, Fleszar was represented by counsel at the close of discovery, and no discovery motions were filed during the course of discovery. Fleszar's Motion to Reopen Discovery and Sanction is denied.

<em>Fleszar's Department Within the AMA</em>

Except as otherwise noted, the following facts are taken from AMA's Statement of Material Facts pursuant to Local Rule 56.1. As discussed above, Fleszar did not file a proper response to that statement. Consequently, nearly all of AMA's facts are deemed admitted.

AMA is a not-for-profit, professional-membership organization, which employs approximately 1,100 employees at its Chicago headquarters. (Def. 56.1 ¶ 5.) Fleszar began working for AMA in 1980. (Def. 56.1 ¶ 6.) Her employment was terminated in 1991 as part of a downsizing effort, but she was rehired in 1992. (Def. 56.1 ¶ 6.) Fleszar worked in the Hospital Medical Staff Section of AMA, which was renamed the Department of Organized Medical Staff Services (the "Department") in 1995. (Def. 56.1

4

¶ 6.) She worked in the Department until her employment was again terminated on August 24, 2007. (Def. 56.1 ¶ 6.)

The Department supports a group of physicians known as the Organized Medical Staff Section ("OMSS"). (Def. 56.1 ¶ 7.) The Department is headed by a Director, who supervises the employees in the Department, oversees work, determines how work is to be performed, and assigns tasks. (Def. 56.1 ¶ 8.) Three employees report to the Director: a policy analyst, a staff assistant, and a program administrator (Fleszar). (Def. 56.1 ¶ 7.) In 1997, Fleszar's title was reclassified as "Program Development Manager." (Def. 56.1 ¶ 26; Pl. Mot. to Strike 9.)

Michael Vitek was the Director at the time Fleszar was hired and maintained that position through June 2005. (Def. 56.1 ¶ 9.) He retired in June 2005; Joe Ann Jackson served as Interim Director until January 2006, at which time Jack Aenchbacher became Director. (Def. 56.1 ¶ 9.) After Aenchbacher moved to another position within AMA, James DeNuccio was hired as Director in November 2006. (Def. 56.1 ¶ 9.) DeNuccio remained Director through the time of Fleszar's termination. (Def. 56.1 ¶ 9.)

*Fleszar's Disease*

Fleszar was diagnosed with Crohn's disease in 1996. (Def. 56.1 ¶ 12.) Between 1996 and 2004 she was "pretty much in remission." (Def. 56.1 ¶ 20.) When she did have flare-ups, they typically lasted between one and three days, and they often could be controlled by medication; when they could not, she would visit her doctor, who often would prescribe medication and advise her to eat a bland diet and to rest. (Def. 56.1 ¶ 20.) Fleszar requested a medical leave of absence from AMA in 1996 and submitted a

5

medical certification form in support of this request to the AMA Human Resources Department ("HR"), stating that she was diagnosed with "Crohn's, ilitis" [sic]; that she had been in the hospital; and that her regimen of treatment was "Prednisone and Asacol, Pepcid, visits to office every 2 weeks." (Def. 56.1 ¶ 12.) AMA granted her request. (Def. 56.1 ¶ 12.) Fleszar told then-Director Vitek that she was ill, that she was in the hospital, that she had been diagnosed with Crohn's disease, and that stress aggravated her condition. (Def. 56.1 ¶ 13.) She later told Vitek that she would need to rest when flare-ups occurred and that she had some dietary restrictions and problems with acid reflux. (Def. 56.1 ¶ 13.) Vitek allowed Fleszar to work on a part-time basis for a week or two following her return from leave in 1996. (Def. 56.1 ¶ 14.) He also offered to exchange one of Fleszar's job assignments (staffing a meeting of an OMSS committee) with other less-stressful assignments. (Def. 56.1 ¶ 14.) Fleszar agreed to the exchange. (Def. 56.1 ¶ 14.) At no time during the remainder of her employment with AMA did Fleszar request any other accommodations. (Def. 56.1 ¶ 14.)

Fleszar took another medical leave of absence for three weeks in mid-2004. (Def. 56.1 ¶ 15.) She submitted a medical certification form to HR, stating that she had "Acute situational anxiety response & exacerbation of irritable/inflammatory bowel disease." (Def. 56.1 ¶ 15.) Fleszar did not provide this form to her supervisor and has no evidence that anyone else did. (Def. 56.1 ¶ 15.) Her FMLA request was granted. (Def. 56.1 ¶ 15.) Fleszar told Vitek that she was having issues with her Crohn's disease, that she was ill and unable to work, and that she was concerned about inflammatory disease and bowel disease. (Def. 56.1 ¶ 15.) At some point in 2004, Fleszar also told Peggy Boswell,

Director of Employment Services in HR, of her condition – Boswell also suffers from Crohn's disease. (Def. 56.1 ¶ 18; Pl. Mot. to Strike 9.)

Fleszar took a third medical leave of absence for one week in August 2005. (Def. 56.1 ¶ 16.) She submitted a medical certification form to HR, stating that she had "abdominal discomfort & diarrhea" and "an upper respiratory tract infection." (Def. 56.1 ¶ 16.) Her request for FMLA leave was again granted. (Def. 56.1 ¶ 16.) Fleszar informed then-Interim Director Jackson that she was undergoing a battery of tests and that she had been ordered to rest and to take medicines and clear fluids. (Def. 56.1 ¶ 16.) At various times, Fleszar also told Jackson that she had Crohn's Disease, that she had bloating and "bathroom issues," and that she was tired. (Def. 56.1 ¶ 16.) Later, Director Aenchbacher and Todd VandeHey, head of the Governance Unit of AMA (of which OMSS was a part), also became aware that Fleszar had Crohn's disease. (Def. 56.1 ¶ 18.)

The aforementioned leaves of absence in 1996, 2004, and 2005 are the only medical leaves Fleszar took from AMA; and other than three days in August 2007, Fleszar cannot remember any other days she was absent from work because of her Crohn's disease between the end of medical leave in 2004 and the termination of her employment on August 24, 2007. (Def. 56.1 ¶ 17.)

In response to AMA's interrogatories regarding her claimed disability, Fleszar claims that her physical impairments substantially limit her in the major life activities of eating, taking care of herself, and digestion. (Def. 56.1 ¶ 21.) When asked how her ability to eat was limited, she testified that she had to eat a bland diet and avoid citrus and

high-fiber foods during flare-ups and, during certain flare-ups, maintain a diet of mostly liquids. (Def. 56.1 ¶ 22.) Otherwise, she was able to eat normally. (Def. 56.1 ¶ 22.) When asked how her ability to care for herself was limited, Fleszar testified that she had to watch what she ate and rest in bed during severe flare-ups and that she had difficulty walking due to pain in her side during severe flare-ups. (Def. 56.1 ¶ 23.) She was not otherwise limited in her ability to walk and, unless she was resting, she was not limited in her ability to see, cook, clean, dress herself, or perform manual tasks around her home. (Def. 56.1 ¶ 23.) When asked how her digestion was limited, Fleszar testified that she had to consume a bland diet and had bouts of diarrhea during some flare-ups. (Def. 56.1 ¶ 24.) Fleszar never told anyone at AMA about any restrictions in her ability to eat, care for herself, or digest food because of Crohn's disease. (Def. 56.1 ¶¶ 22-24.)

*Fleszar's Job Duties and Performance*

Beginning in October 2005, AMA undertook a Job Assessment Systems Initiative ("JASI") to review job descriptions, titles, and grades of all AMA employees. (Def. 56.1 ¶ 31.) In connection with JASI, a job-description questionnaire was completed for each position, either by an employee in that position or by a manager supervising that position. (Def. 56.1 ¶ 32.) At VandeHey's request, Fleszar submitted a proposed job description for her position. (Def. 56.1 ¶ 32.) VandeHey then filled out Fleszar's questionnaire, submitted it to the JASI team, and forwarded Fleszar a copy of it on or shortly after November 30, 2005. (Def. 56.1 ¶ 32.)

In February 2006, Fleszar complained to HR that the position description submitted by VandeHey did not accurately summarize her responsibilities and duties.

8

(Def. 56.1 ¶ 35.) At the direction of HR Senior Vice President, Robert Davis, Boswell investigated Fleszar's complaint and concluded that the submitted job description was essentially the same as the one Fleszar had herself proposed. (Def. 56.1 ¶ 35.) Boswell communicated her conclusion to Fleszar in a meeting on or around February 24, 2006. (Def. 56.1 ¶ 35.)

In June 2006, employees received new, streamlined job descriptions and salary grades (on a new scale), effective July 1, 2006. (Def. 56.1 ¶ 31.) The JASI team decided that Fleszar's job title should be changed from Program Development Manager to Program Development Administrator because her responsibilities were not consistent with a manager title as compared to other AMA positions. (Def. 56.1 ¶ 33.) Another employee in the Governance Unit – who was not disabled – also received the same change in title. (Def. 56.1 ¶ 33.) Fleszar's salary did not change; she received a grade on the new scale that was equivalent to the grade she was assigned on the previous scale. (Def. 56.1 ¶ 34.) Six other employees in the Governance Unit held the same pay grade as Fleszar on the old scale, and all six were assigned the same grade as Fleszar on the new scale. (Def. 56.1 ¶ 34.)

After assuming the Director position, DeNuccio began holding regular meetings with each of the employees to discuss their duties and responsibilities and his expectations and requirements. (Def. 56.1 ¶ 39.) Fleszar feels that he took away some of her duties and added duties that she traditionally had not performed and that were not within the four corners of her written job description, though she admits that the Director

had the authority to assign her work that was outside the four corners of her written job description. (Def. 56.1 ¶¶ 39-40.)

On December 1, 2006, Fleszar sent DeNuccio an email, complaining that she had not been included in certain meetings and on certain emails, that some of her duties had been reassigned, and that he had been choosing to consult other individuals in the Department with less experience than she had. (Def. 56.1 ¶ 42) She also complained that, on November 11, 2006, one of her coworkers had erroneously accused Fleszar of providing incorrect information or changing information in certain Department documents and told Fleszar to "get the heck out of [her] office." (Def. 56.1 ¶ 43.)

In early 2007, DeNuccio requested that Fleszar perform a "Sunset Review" project, which involved preparing certain AMA policies for review by the Governing Council. (Def. 56.1 ¶ 45.) Fleszar objected to the assignment, telling DeNuccio she would not do the project until her written job description was changed to reflect these tasks and her salary was increased. (Def. 56.1 ¶ 45.) On January 8, 2007, Fleszar complained to Boswell and Davis in HR about DeNuccio's request and stated that she did not believe these job assignments were within her written job description. (Def. 56.1 ¶ 46.) After investigating Fleszar's complaint, Boswell concluded that DeNuccio's requests were reasonable. (Def. 56.1 ¶ 46.)

On January 16, 2007, despite two prior warnings from supervisors not to air disputes with Governing Council members, Fleszar sent an email to the chair of the OMSS Governing Council, Dr. Stephen House, informing Dr. House of her dispute with DeNuccio. (Def. 56.1 ¶ 47.) On January 22, 2007, Fleszar sent an email to Boswell and

Davis, again complaining about assignments she had received from DeNuccio. (Def. 56.1 ¶ 48.) Boswell again investigated Fleszar's complaints and concluded that they were without merit. (Def. 56.1 ¶ 48.) That same day, Fleszar received a memorandum from DeNuccio, memorializing DeNuccio's communication that the Sunset Review assignment was both appropriate and covered by her existing job description. (Def. 56.1 ¶ 49.) DeNuccio's memorandum also stated, "Involving Governing Council members and/or other OMSS Staff in issues concerning operations or work assignments is inappropriate" and, in response to Fleszar's insistence that she would not perform policy work until her written job description was revised, that Fleszar had been provided with a revised job description for her position and that HR had been asked to determine whether her pay grade remained appropriate. (Def. 56.1 ¶ 49.)

On March 7, 2007, Fleszar received an email from Davis, stating that he had concluded that her position had been slotted properly and that her job grade would remain the same. (Def. 56.1 ¶ 50.)

In 2007, Fleszar received a performance review from Aenchbacher and DeNuccio regarding her performance in 2006. (Def. 56.1 ¶ 53.) She received an overall rating of 3.5 out of 5.0 – half way between "fully meets standards" and "often exceeds standards." (Def. 56.1 ¶ 53.) She complained to Davis about it. (Def. 56.1 ¶ 53.)

In early 2007, Fleszar had repeated unscheduled absences from work – she was absent on January 4 for vacation; she called in sick on January 15, 19, and 23; and she had partial-day absences on January 17, 22, and 25. (Def. 56.1 ¶ 54.) Her days off for illness were due to an upper respiratory infection, a sore throat, a rash, problems with her

knee, and profuse sweating at night. (Def. 56.1 ¶ 54.) She told her doctor she had been having some abdominal bloating but that it had been resolved before January 17. (Def. 56.1 ¶ 54.) On February 20, 2007, DeNuccio gave Fleszar a written warning, which was approved by HR; the warning was to serve "as a written warning concerning [Fleszar's] inappropriate and unprofessional behavior and advise [her] of [DeNuccio's] concerns regarding [Fleszar's] unscheduled time off." (Def. 56.1 ¶ 55.) DeNuccio's warning specifically addressed problems with the Sunset Review project and Fleszar's seven unscheduled absences since the first of the year. (Def. 56.1 ¶ 55.) She was placed on warning status for 60 days and advised that "[a]ny further demonstrations of inappropriate/unprofessional behavior or unscheduled absences may result in further disciplinary action, up to and including termination of employment." (Def. 56.1 ¶ 55.)

Fleszar's performance issues continued after receiving DeNuccio's warning. (Def. 56.1 ¶ 56.) She failed to complete assignments to prepare minutes of an OMSS Governing Council meeting and to identify program speakers for an AMA semi-annual meeting in a timely manner. (Def. 56.1 ¶ 56.) As a result, on April 24, 2007, Fleszar was placed on probation for 120 days, as detailed in a memorandum, which was approved by HR. (Def. 56.1 ¶ 57.)

On April 27, 2007, Fleszar filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (the "Discrimination Charge"), alleging that AMA discriminated against her on the basis of her disability by amending her job description as part of the JASI process to omit key responsibilities, assigning her a lower pay grade, placing her on probation, giving her an inaccurate performance

evaluation, and giving her a significantly lower bonus than other employees.[2] (Def. 56.1 ¶ 58.)

In May 2007, AMA circulated an internal publication in which employees with 25 or more years of service to AMA were honored. (Def. 56.1 ¶ 59.) When Fleszar complained that her name was not on the list, another AMA employee explained that she understood Fleszar did not want to be included, based on Fleszar's statement that she would not attend the luncheon if DeNuccio was going to be there. (Def. 56.1 ¶ 59.) A revised version was circulated the following day; Fleszar's name was included, along with the names of two other employees who also had been omitted. (Def. 56.1 ¶ 59.)

In early 2007, DeNuccio assigned Fleszar the responsibility for developing and implementing a pilot education program on medical staff self governance. (Def. 56.1 ¶ 62.) In June 2007, he directed her to prepare a report to be reviewed by the OMSS Governing Council at its August 2007 meeting and by AMA's Board of Trustees at its September 2007 meeting. (Def. 56.1 ¶ 62.) On August 1, 2007, DeNuccio reminded Fleszar that draft reports needed to be submitted to senior AMA executives by August 8 and that he would need a draft early in the week of August 6. (Def. 56.1 ¶ 63.) On August 6, 2007, Fleszar informed DeNuccio that she was staying home to work on it.

---

[2] Fleszar also alleged discriminatory acts dating back to 2004. However, only claims based on acts or occurrences within 300 days of the date she filed her EEOC charge can be considered. *See Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 239 (7th Cir. 2004). Fleszar did not file her first charge until April 27, 2007. Accordingly, any acts alleged to have occurred before July 1, 2006, need not be discussed here.

(Def. 56.1 ¶ 63.) However, she never provided DeNuccio with a draft report or any other materials on the project. (Def. 56.1 ¶ 63.)

Fleszar failed to meet August 2007 deadlines on a number of other projects as well. (Def. 56.1 ¶¶ 64-66.) On August 20, 2007, DeNuccio sent Fleszar an email concerning her failure to fulfill long-pending responsibilities. (Def. 56.1 ¶ 69.) He sent her another email later that day, informing her that he was taking over and/or reassigning some of her projects and that she would need to email him working documents and status reports before she left for the day. (Def. 56.1 ¶ 70.) By 8:54 a.m. the following morning, DeNuccio had not received anything from Fleszar, so he sent another email, explaining that it was essential that she take care of it first thing in the morning. (Def. 56.1 ¶ 71.) Fleszar did not respond to the emails and did not provide DeNuccio with the requested materials. (Def. 56.1 ¶ 71.)

DeNuccio summoned Fleszar to a meeting in his office that afternoon; in the presence of Boswell, he repeated his request for the materials. (Def. 56.1 ¶ 72.) Fleszar went to her desk and retrieved an incomplete set of materials. (Def. 56.1 ¶ 72.) Boswell advised her that she need not return to work if she did not willingly provide DeNuccio with the remaining materials by the following morning. (Def. 56.1 ¶ 72.) Fleszar admits that she did not complete the assignments. (Def. 56.1 ¶ 73.)

DeNuccio and Boswell then discussed Fleszar's work performance during her 120-day probationary period, which was scheduled to end that week. (Def. 56.1 ¶ 74.) Based on Fleszar's repeated failure to perform assigned duties and her insubordinate refusal to comply with DeNuccio's directions, Boswell and DeNuccio decided to

terminate her employment. (Def. 56.1 ¶ 74.) They met with Fleszar on August 22, 2007, and told her that her employment would terminate on August 24, 2007, because of her poor work performance. (Def. 56.1 ¶ 74.) Out of concern that Fleszar would take AMA documents with her following the termination of her employment, Boswell escorted Fleszar, outside of the sight of any other AMA employees, to the lobby of the building. (Def. 56.1 ¶ 75.)

On June 13, 2008, Fleszar filed another charge of discrimination with the EEOC, alleging that AMA retaliated against her in violation of the ADA (the "Retaliation Charge"). (Def. 56.1 ¶ 3.) Fleszar does not claim any additional acts of discrimination in her Retaliation Charge. (Def. 56.1 ¶ 3.) And she admits that she did not receive any discipline between the time she filed her Discrimination Charge and her termination. (Def. 56.1 ¶ 76.) Furthermore, Fleszar never discussed her Discrimination Charge with DeNuccio and is unaware of whether he even knew about it. (Def. 56.1 ¶ 76.) Her belief that DeNuccio retaliated against her because of her Discrimination Charge is based solely on the fact that certain events occurred following her filing of the Discrimination Charge. (Def. 56.1 ¶ 76.)

By Fleszar's own account, the most she ever told DeNuccio about her alleged disability was that she had been diagnosed with Crohn's disease, that stress aggravated her condition, that during flare-ups of her condition she had "stomach problems" and "intestinal issues," and that Vitek had assumed her responsibility for staffing reference-committee meetings because those meetings were stressful. (Def. 56.1 ¶ 19.) She never told him about any limitations on her ability to eat, digest food, or care for herself as a

result of Crohn's disease. (Def. 56.1 ¶ 20.) Fleszar is not aware of any AMA employee

with similar performance issues who was put on a performance improvement plan, nor is

she aware of any Department employee who failed to complete assignments to the extent

Fleszar failed to do so without being fired. (Def. 56.1 ¶¶ 79-80.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the

court of the basis for its motion and identifying the evidence it believes demonstrates the

absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest

on conclusory pleadings but "must present sufficient evidence to show the existence of

each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel*

*Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not

sufficient to oppose a motion for summary judgment, nor is a metaphysical doubt as to

the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000)

(citations omitted). Rather, the evidence must be such "that a reasonable jury could

return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625

(7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

(*Anderson*)). In considering a motion for summary judgment, the court must view the

evidence in the light most favorable to the nonmoving party and draw all reasonable

16

inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

### Count I

Count I is a claim for discrimination in violation of the ADA. It fails because Fleszar has not produced any evidence that she is "disabled." A person is "disabled" within the meaning of the ADA if (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment by her employer. 42 U.S.C. § 12102(2)(A).[3]

The EEOC's interpretive regulations define "substantially limits" as "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j) (1999).

The fact that Fleszar has been diagnosed with Crohn's disease is not alone sufficient for her to qualify as disabled under the ADA. *See, e.g., Block v. Sec'y of State*, No. 09-117-DRH, 2010 WL 5178032, at *5 (S.D. Ill. Dec. 15, 2010) (holding that

---

[3] The ADA was amended, effective January 1, 2009. The amendments are not retroactive. *See Fredricksen v. United Parcel Serv. Co.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009). Because all alleged discrimination occurred before January 1, 2009, all ADA citations herein are to the 2006 version of the United States Code.

plaintiff with Crohn's disease was not disabled for purposes of ADA); *Banks v. CBOCS West, Inc.*, No. 01 C 795, 2005 WL 1126913, at *6 & n.4 (holding that the particular plaintiff's Crohn's disease was a disability because he "suffers from pain and diarrhea on a daily basis, necessitating up to a dozen trips to the restroom on any given day" but stating that Crohn's disease is not a disability *per se* because symptoms can range from "mild to severe"). A particular medical condition may be disabling for some individuals and not for others; whether it qualifies as a disability must be determined on a case-by-case basis. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 938 (7th Cir. 2007) (citation omitted).

As discussed above, Fleszar asserts that she was limited in the major life activities of eating, caring for herself, and digestion. The undisputed facts, however, demonstrate that any such limitations were not "substantial," as required by the ADA.

With regard to eating, significant dietary restrictions can, indeed, substantially limit a person's ability to eat. For example, in *Lawson v. CSX Transportation, Inc.*, 245 F.3d 916, 924 (7th Cir. 2001), the Seventh Circuit noted the "dire and immediate consequences" that a particular diabetic plaintiff would suffer if he did not monitor his glucose levels, adjust his food intake and level of exertion, and stop all activities to find food that would restore his glucose levels when his blood sugar drops. The Seventh Circuit noted that "[i]t is the severity of these limitations on his ability to eat that distinguishes [plaintiff's] situation from that of other individuals who must follow the simple 'dietary restrictions' that medical conditions sometimes entail." *Id.* at 924-25 (compiling cases in which dietary restrictions did not "substantially" limit the activity of

eating). Fleszar's occasional dietary restrictions appear to be a limitation that is moderate, at best. The undisputed facts do not show any substantial limitation to her ability to eat.

Evidence is similarly lacking to show that Fleszar's digestion was significantly limited. The undisputed facts show only that she had occasional flare-ups and bouts of diarrhea; they do not indicate that she was substantially limited in her ability to go to the bathroom or otherwise digest food. The same is true regarding Fleszar's ability to care for herself. The undisputed facts show that the only limitation she suffered in this regard is that occasionally severe flare-ups made it difficult for her to walk and that, unless she was resting during a flare-up, she was not limited in her ability to see, cook, clean, dress herself, or perform tasks around her home.

The undisputed facts also reveal no record of Fleszar's being substantially limited in her ability to eat, digest food, and care for herself and no evidence that AMA regarded her as having such limitations. Thus, there is no evidence that Fleszar was disabled within the meaning of the ADA, and AMA is entitled to summary judgment on Count I.

*Count II*

Count II is for retaliation in violation of the ADA. A plaintiff can establish a claim for retaliation under the ADA using a direct method of proof if she can show evidence that (1) she engaged in a statutorily protected activity, (2) she suffered an adverse action, and (3) a causal connection exists between the two. *Squibb v. Mem. Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). A plaintiff may also establish a claim under the indirect method of proof: instead of offering direct evidence of a causal

19

connection, she must prove that she was performing her job satisfactorily and that no similarly situated employee who did not engage in a protected activity suffered a materially adverse action. *Id.* at 788.

Most of the conduct of which Fleszar complains (e.g., DeNuccio's giving her additional assignments and the omission of her name from a list of honored employees) does not qualify as an adverse employment action, which must be "materially adverse" – that is, it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). For those alleged acts that could be construed as adverse employment actions – the termination of her employment, in particular – there is no evidence of a causal connection between those acts and Fleszar's act of filing her Discrimination Charge. The fact that the conduct of which she complains followed her filing of the Discrimination Charge is insufficient to establish a claim for retaliation. *Cf. Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) ("[S]uspicious timing, standing alone, will rarely be sufficient . . . to create a triable issue.") (citation and internal quotation marks omitted); *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005) ("*Post hoc ergo propter hoc* is not a good way to establish causation."). Fleszar never discussed her Retaliation Charge with DeNuccio and is unaware of whether he even knew about it. There is no evidence in the record to show that any of DeNuccio's actions were the result of Fleszar's filing the Discrimination Charge.

Fleszar also cannot prevail using an indirect method of proof because the undisputed facts show that she was not meeting AMA's legitimate expectations at the

time she suffered any alleged retaliatory conduct. She was on probation when she filed her Discrimination Charge on April 27, 2007; and she failed to complete a number of assignments and meet critical deadlines in the time leading up to her notice of termination on August 22, 2007. Therefore, AMA is entitled to summary judgment on Count II.

*Count III*

Count III is a claim for intentional infliction of emotional distress under Illinois common law. AMA argues that none of the alleged conduct can be considered outrageous as a matter of law and that Fleszar has no evidence that any of it was done with the intent to cause Fleszar to suffer severe emotional distress. Much of the alleged conduct Fleszar claims as outrageous occurred outside the period applicable to her ADA claims and would thus require the analysis of facts beyond those alleged to support her federal claims. Because all claims arising under federal law have now been disposed of in AMA's favor, the Court declines to exercise supplemental jurisdiction over Fleszar's sole remaining state-law claim. Count III is dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

**CONCLUSION**

For the reasons discussed above, Fleszar's Motion for Leave to Amend Document #66 [67] is granted, and her Motion to Strike Document #62 [66] and Motion to Reopen Discovery and Sanction [71] are denied. AMA's Motion for Summary Judgment [60] is granted in part. Judgment is awarded in favor of AMA and against Fleszar on Counts I and II. Count III is dismissed without prejudice.

Date: _September 1, 2011_

_____
JOHN W. DARRAH
United States District Court Judge